**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                              **Case Nos. 8:23-cr-473-VMC-TGW**
                                                          **8:14-cr-415-VMC-AEP**

**AARON MICHAEL BICKNELL**

_____/

### SENTENCING MEMORANDUM

Mr. Bicknell's probation officer, undoubtedly with the best intentions, told him that he must inform any potential dates or lovers that he is a registered sex offender. This requirement understandably stunted any hope Mr. Bicknell could have for healthy sexual relationships with adult women. (Not a good opening line on a first date). But sexual energy will normally run somewhere, and for Mr. Bicknell it unfortunately tends toward online child pornography. On top of this, Mr. Bicknell suffered from terrible depression, insomnia, and headaches, which he self-treated through alcoholism, impairing his judgment. He faces separate sentences for a new conviction and violations of his supervised release, including a mandatory minimum 15 years' imprisonment. The presentence report incorrectly inflates his offense level by using the Sentencing Commission's discredited 75:1 video-to-image ratio. Correctly calculated, his guidelines range should be well below the statutory minimum. This Court should sentence Mr. Bicknell to the statutory minimum 15

years' imprisonment for his new offense, and 1 year's imprisonment for the violation of his supervised release, with the sentences run concurrently.[1]

## BACKGROUND

Mr. Bicknell has been before this Court before.  In 2014, Mr. Bicknell pled guilty to possession of child pornography, and this Court sentenced him to 84 months' imprisonment and supervised release for life.  According to a memorandum filed by his probation officer, when Mr. Bicknell was first released, he did fairly well. Although he technically violated the terms of his release by making contact with his niece and nephew on the day of his arrest,he self-reported this conduct to his probation officer immediately when the probation officer instructed him on the terms of release.  He also mentioned that he was struggling with insomnia and depression. The probation officer was able to provide Mr. Bicknell with mental health counseling and medication.  Mr. Bicknell acknowledged his early mistake and accepted correction, and acknowledged his struggles and accepted help.

Mr. Bicknell had a stable residence, living with his sister in Zephyrhills, Florida, and a stable job, working for a metal company.  He attended sex offender counseling and received medication for his depression and insomnia.  He had

---

[1] Identical versions of this sentencing memorandum are filed contemporaneously in both of Mr. Bicknell's cases before the Court.

suffered from severe migraines since his teenage years, but in 2021 he got into a car accident, and his migraines became much worse.  He also transitioned unsuccessfully to a new medication provider, allowing his prescriptions to go unfilled.  Depressed, in pain, and unable to sleep, he turned to alcohol.  Alcohol will help a great deal temporarily, but will only exacerbate most problems in the long run.  And, of course, it seriously impairs one's judgment.

At the same time, Mr. Bicknell's probation officer ordered him to disclose his sex offender status to potential romantic interests.  (One term of his supervised release, a standard one, was to follow the instructions of the probation officer).  Mr. Bicknell's probation officer undoubtedly had Mr. Bicknell's best interests and those of the public in mind, and he is among the most respected supervising probation officers among a wide range of stakeholders, including and especially defendants and defense attorneys.  But this instruction left Mr. Bicknell with little chance at healthy adult relationships.  Alcoholic, depressed, and without any sexual outlet, Mr. Bicknell found himself looking for child pornography again.  As Mr. Bicknell explained to the presentence-investigation probation officer, he "went down a rabbit hole," and his descent back into his previous crime got worse and worse.

Despite Mr. Bicknell's serious failures, his criminal history is limited to the cases before this Court.  He has no history of harming children.  He pled guilty and accepted responsibility.

3

ARGUMENT

The Court should sentence Mr. Bicknell to 15 years' imprisonment, consisting of a sentence of 15 years' imprisonment on the new conviction and 1 year's imprisonment for the violation of supervised release, each sentence run concurrently. When the number-of-images enhancement is correctly reduced, Mr. Bicknell's guidelines range would be below the statutory minimum sentence, so that the minimum acts to increase the sentence beyond what the Sentencing Commission considers to be a sufficient sentence. Thus, Mr. Bicknell will be sentenced beyond what the Guidelines would call for on the new conviction, and the Court need not incrementally increase the total sentence for the supervised-release violation.

## I.  The number of "images" is 180.

The presentence report notes that Mr. Bicknell was in possession of 100 still images and 80 videos. But the presentence report concludes that Mr. Bicknell possessed 6,100 "images" by multiplying the number of videos by 75, and applies an enhancement for possessing 600 images or more. The presentence report does not discuss the length of the 80 videos outside of describing one video as being 48 seconds long, and makes no effort to tally a total number of frames within the videos that constitute child pornography.

The probation officer's 75:1 multiplier is based on the Guidelines' Commentary, but that Commentary should be rejected by this Court. The

4

enhancement applies when the offense involves a number of "images" designated in a table. *See* U.S.S.G. § 2G2.2(b)(7). The word "images" is not defined in the guideline. The commentary provides that "images" means "any visual depiction, as defined in 18 U.S.C. § 2256(5), that constitutes child pornography, as defined in 18 U.S.C. § 2256(8)." *Id.* § 2G2.2 cmt. n.6(A). Section 2256(5), in turn, provides that "'visual depiction' includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format." 18 U.S.C. § 2256(5). Next, the commentary provides its 75:1 multiplier: "Each video, video-clip, movie, or similar visual depiction shall be considered to have 75 images." U.S.S.G. § 2G2.2 cmt. n.6(B)(ii).

This commentary is owed no deference because it does not interpret the word "images," it legislates a policy preference. And the plain meaning of "images" dictates that one video is one image. Finally, even if "images" means "frames," as some courts have said, the Government has not proven how many frames of the videos that Mr. Bicknell possessed contained child pornography.

A. <u>The commentary is owed no deference.</u>

The commentary is owed no deference because the Commission's 75:1 ratio does not fall within any zone of ambiguity emanating from the word "images." The

5

commentary cannot expand the interpretation of unambiguous sentencing guidelines. *United States v. Dupree*, 57 F.4th 1269, 1273 (11th Cir. 2023). And even if a guideline is ambiguous, the commentary must provide an interpretation that is within the "zone of ambiguity" the court has identified. *Kisor v. Wilkie*, 588 U.S. 558, 576 (2019). "To be a 'reasonable interpretation' of a Guideline, a rule contained in the commentary must first be an 'interpretation' of that Guideline, not a 'substantive policy choice.'" *United States v. Phillips*, 54 F.4th 374, 387 (6th Cir. 2022) (Larsen, J., concurring in the judgment) (citing *United States v. Riccardi*, 989 F.3d 476, 487 (6th Cir. 2021)). "'[A] specific numeric amount . . . generally will not qualify as a mere "interpretation" of general nonnumeric language.'" *Id.* (quoting *Riccardi*, 989 F.3d at 487); *see also Cath. Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010); *Hoctor v. USDA*, 82 F.3d 165, 169-71 (7th Cir 1996); *United States v. Bert*, 292 F.3d 649, 652 (9th Cir. 2002).

The commentary's 75:1 rule is not a reasonable interpretation within any zone of ambiguity coming from the word "images." "Image" means "[a] physical or digital representation of something, originally captured using a camera from visible light, and typically reproduced on paper, displayed on a screen, or stored in a computer file." *Phillips*, 54 F.4th at 391 (Larsen, J., concurring in the judgment) (quotation omitted). The Commission's numerical 75:1 rule is not an interpretation of this nonnumerical word. *Id.* at 389-90 (Larsen, J., concurring in the judgment).

6

The commentary is therefore owed no deference.  *Id.* at 390 (Larsen, J., concurring in the judgment).

B.  <u>"Image" means "video."</u>

When, as here, a term "[l]ack[s] applicable statutory definitions, 'we look to the common usage of words for their meaning' and may turn to 'dictionary definitions for guidance.'"  *United States v. Hall*, 64 F.4th 1200, 1205 (11th Cir. 2023) (quoting *CBS Inc. v. PrimeTime*, 24 Joint Venture, 245 F.3d 1217, 1222−23 (11th Cir. 2001)); *see also Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

The relevant statutory term here is "images."  Again, the dictionary definition of "image" is "[a] physical or digital representation of something, originally captured using a camera from visible light, and typically reproduced on paper, displayed on a screen, or stored in a computer file."  *Phillips*, 54 F.4th at 391 (Larsen, J., concurring in the judgment) (quotation omitted).  An ordinary English speaker commonly uses the word "image" when talking about a picture of something.  *See Wooden v. United States*, 595 U.S. 360, 367 (2022) (interpreting the term "occasion" and considering how "an ordinary person" "might describe Wooden's ten burglaries—and how she would not.").  Consider the examples below:

- I took a stunning *image* of a sunset with my camera.

- In today's digital age, we can easily share *images* with friends and family through social media.

- She edited the video to enhance the *image* quality.

- The news report featured a shocking *image* of the aftermath of the earthquake, highlighting the devastating impact it had on the community.

- My favorite part of our family vacation are the *images* in my mind of the kids playing on the beach.

As these examples show, "image" is often used interchangeably with "picture." And depending on the context in which it is used, "image" doesn't just mean any "picture," but refers to a particular picture, no matter if the "image" is depicted in a still photo or a video. For example, in the first sentence above, "image" is used to refer to a photo of a sunset. But, in the earthquake example, "image" is referring to pictures of the damage caused by the disaster displayed in a video.

As such, two important points follow from the ordinary usage of "images." First, when an ordinary English speaker says "images," he does not delineate between images in a photo and a video. Rather, when a person says "image," he is just referring to a picture of something. Second, when a person says "images," he is usually referring to particular pictures, depending on context. The plain meaning of "images" therefore does not distinguish between a still photo and a video. Therefore, under this ordinary meaning, a child pornography video counts as only one image for purposes of USSG § 2G2.2(b)(7).

8

The word "images" does not mean "frames," as some judges and courts have said.  *See Phillips*, 54 F.4th at 391 (Larsen, J., concurring in the judgment); *United States v. Haggerty*, __ F.4th __, 2024 WL 3335491, at *11 (3d Cir. 2024).  This line of argument requires the conclusion that "image" necessarily refers to a *still* representation.  *See Phillips*, 54 F.4th at 391 (Larsen, J., concurring in the judgment).  But the dictionary definition of "image" – "[a] physical or digital representation of something, originally captured using a camera from visible light, and typically reproduced on paper, displayed on a screen, or stored in a computer file" – does not include any requirement that the representation be still.  A great many "representations" "displayed on a screen" or "stored in a computer file" are videos, and yet are still images under this definition.  And ordinary usage of "images" demonstrates that a normal English speaker might very often use "image" to refer to a moving picture or video, as in the example given above, "The news report featured a shocking *image* of the aftermath of the earthquake, highlighting the devastating impact it had on the community."  So the underlying premise on which these judges have relied is wrong.

In any event, to the extent there is ambiguity to "images" – because it may mean "videos," "frames," or something else, like "scenes," *see Phillips*, 54 F.4th at 392 (Larsen, J., concurring in the judgment) – the rule of lenity requires reading the word to mean "videos."  *See United States v. Nasir*, 17 F.4th 459, 474 (3d Cir. 2021 (en

9

banc) (Bibas, J., concurring) ("When a [G]uideline is ambiguous, the rule of lenity calls for adopting the more lenient of two plausible readings."); *United States v. Campbell*, 22 F.4th 438, 446 (4th Cir. 2022) ("If the meaning of [a Guideline] nevertheless remains ambiguous at this point, 'the rule of lenity has some force' here." (quoting *United States v. Winstead*, 890 F.3d 1082, 1092 n.14 (D.C. Cir. 2018 (alteration adopted))). "The rule of lenity is one of the oldest and most traditional tools of statutory interpretation." *Romero v. Sec'y U.S. Dep't of Homeland Security*, 20 F.4th 1374, 1383 (11th Cir. 2021); *see United States v. Wiltberger*, 18 U.S. 76, 95 (1820) ("The rule that penal laws are to be construed strictly[ ] is perhaps not much less old than construction itself."); *see also Kisor*, 139 S. Ct. at 2448 (Gorsuch, J., concurring in the judgment) (explaining that the traditional tools of construction include "all sorts of tie-breaking rules for resolving ambiguity").[2]

Lenity "is founded on the tenderness of the law for the rights of individuals," *Wiltberger*, 18 U.S. at 95, "and the right of every person to suffer only those

---

[2] To be sure, the rule of lenity only comes into play when all the normal tools of statutory interpretation have failed, and that is the same circumstance that *can* trigger deference to the Commentary under *Dupree*. But here, to reiterate, the reason deference does not apply under *Dupree* is that the Commission's interpretation is not reasonable, because it is not an interpretation at all, it is a policy choice. *See Phillips*, 54 F.4th at 387 (Larsen, J., concurring in the judgment). And, in any event, where the rule of lenity and agency deference come into conflict, the rule of lenity prevails. *See United States v. Phifer*, 909 F.3d 372, 385 (11th Cir. 2018).

punishments dictated by 'the plain meaning of words,'" *Wooden*, 595 U.S. at 390 (Gorsuch, J., concurring in the judgment) (quoting *Wiltberger*, 18 U.S. at 95–96). *See* Amy Coney Barrett*, Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 129 (2010) (stating that lenity is "unabashedly grounded in a policy of tenderness for the accused"). It is a "longstanding safeguard against excessive punishment," *Nasir*, 17 F.4th at 473 (Bibas, J., concurring), and requires that penal laws be construed strictly, with any ambiguities resolved in favor of the defendant, *see Yates v. United States*, 574 U.S. 528, 548 (2015); *United States v. Caniff*, 955 F.3d 1183, 1191 (11th Cir. 2020). Thus, "where uncertainty exists, the law gives way to liberty." *Wooden*, 595 U.S. at 390 (Gorsuch, J., concurring in the judgment).[3]

Although the Guidelines are now advisory, they are the "lodestone" of sentencing. *Peugh v. United States*, 569 U.S. 530, 544 (2013); *see Nasir*, 17 F.4th at 474 (Bibas, J., concurring) ("Even though the Guidelines are advisory, they exert a law-like gravitational pull on sentences."). The district court must start by correctly

---

[3] The rule of lenity "antedates both state and federal constitutions." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 297 (2012; *see Wiltberger*, 18 U.S. at 95 ("The rule that penal laws are to be construed strictly[ ] is perhaps not much less old than construction itself."). Its application is thus not animated solely by the constitutional requirements of fair notice and separation of powers. Scalia & Garner, *supra* at 296–97; *see Nasir*, 17 F.4th at 473–74 (Bibas, J., concurring) (discussing lenity's three core purposes, including that it serves our nation's "strong preference for liberty").

calculating the Guideline range, which serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). And throughout sentencing, the Guidelines "inform and instruct the district court's determination of an appropriate sentence." *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016) (explaining that the Guidelines are not only starting point but also the lodestar of sentencing).

Given the Guidelines' anchoring role and centrality in sentencing, when confronted with two plausible readings of a Guideline, courts should "adopt[ ] the more lenient." *Nasir*, 17 F. 4th at 474 (Bibas, J., concurring); *see Wooden*, 595 U.S. at 395 (Gorsuch, J., concurring in the result) (explaining that lenity should be employed after applying other traditional tools of statutory construction, rather than looking outside the statute's text). That is, if a comment to an ambiguous Guideline has a "clear tilt" toward harshness, lenity should displace it. *Nasir*, 17 F. 4th at 474 (Bibas, J., concurring).

Under the rule of lenity, the Court should construe the term "image" to mean "a visual representation of something" and find that a "video" counts as one image. Because Mr. Bicknell possessed only 80 videos and 100 still images, he possessed only 180 "images" total. His crime therefore falls within subsection (B) of the "images" table, calling for an increase of three levels, not five. *See* U.S.S.G. § 2G2.2(b)(7). His offense level should accordingly be reduced by two.

12

C.  <u>Even if "images" means "frames," the Government has not shown that Mr. Bicknell possessed 600 or more images.</u>

Even if the Court were to adopt "frames" as the meaning of "images," the Government has not carried its burden to show 600 or more images.  The presentence report says nothing about the length of the 80 videos other than that one was 48 seconds.  It does not count the number of frames in the videos and does not provide the videos' framerates.  Most troubling, the presentence report does not attempt to show what portions of each video contain child pornography and what portions do not.  If "image" means "frame," then any given set of frames within a video may contain no child pornography at all, such as where an empty bed or room is depicted for some period of time while no pornography appears.  Saddled with the burden of proof, the Government has provided no evidence to explain how many frames of child pornography Mr. Bicknell possessed.  Surely, Mr. Bicknell possessed at least 180 images because he possessed 100 still photos and 80 videos, with one video being 48 seconds, some period of which includes child pornography.  But the Government cannot say that the remaining videos add up to more than 600 frames.  The greater-than-600 enhancement therefore does not apply.

## II.  The Court should sentence Mr. Bicknell to a total of 15 years' imprisonment.

Properly adjusted to an offense level of 32, Mr. Bicknell would face a guidelines range of 135 to 168 months' imprisonment.  That is, the Commission

provides that an appropriate sentence for a defendant like Mr. Bicknell is no more than 14 years' imprisonment.  But Mr. Bicknell may not be sentenced to 14 years' imprisonment because he faces a mandatory minimum of 15 years' imprisonment.  Here, though, this one-year increase beyond the usual high end of the guidelines range is not cause for concern.  Mr. Bicknell also faces a guidelines range of 12 to 18 months' imprisonment for his violation of supervised release.  And, normally, a sentence for a violation of supervised release should run consecutively to any other sentence.  *See* U.S.S.G. § 7B1.3(f).  This means that, even in the absence of the statutory minimum sentence for the new conviction, the Commission would consider appropriate a total sentence of 15 years' imprisonment:  14 years for the new conviction and 1 year for the violation of supervised release.  The Court can achieve exactly that result by sentencing Mr. Bicknell to the statutory minimum 15 years' imprisonment on the new indictment and to 1 year's imprisonment on the violation of supervised release, with the terms to run concurrently.

Additionally, Mr. Bicknell's history and circumstances justify a total sentence of 15 years' imprisonment.  His period of supervision started well, but was derailed by his depression and insomnia, and the car accident that made his migraines so much more severe, all of which led to his alcoholism.  The probation officer's instruction to self-report his sex-offender status to romantic partners left him little sexual outlet, and led him down the "rabbit hole" of his old ways.  Most important,

there is no reason to think that Mr. Bicknell would ever harm children.  While the possession of child pornography works a serious but indirect harm on its victims, the greatest concern is that a possessor of child pornography would directly and concretely harm children, suggesting that he should be locked away safely for a long time.  But Mr. Bicknell has never harmed anyone in this way, and that past history shows that he is unlikely to do so in the future, especially following a 15-year prison sentence and a new term of supervised release.  A sentence of 15 years' imprisonment is sufficient to serve the purposes of sentencing.

DATED this 23rd day of July 2024.

Respectfully submitted,

A. FITZGERALD HALL, ESQUIRE
FEDERAL DEFENDER

*/s Samuel E. Landes*
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone:   (813) 228-2715
Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of July 2024, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF

15

system, which will send a notice of the electronic filing to AUSA Erin Favorit.

/s **Samuel E. Landes**
Samuel E. Landes, Esq.